# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# SHREVEPORT DIVISION

| | | |
|---|---|---|
| **THOMAS PAYNE HORN** | * | **CIVIL ACTION NO.  13-0361** |
| **VERSUS** | * | **JUDGE S. MAURICE HICKS** |
| **WARDEN, LOUISIANA STATE PENITENTIARY** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

*Pro se* Petitioner Thomas Payne Horn filed a petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on February 19, 2013 [doc. # 1].  Respondent responded to the petition on June 24, 2013.  [doc. # 22].  Petitioner, an inmate in the custody of Louisiana's Department of Public Safety and Corrections incarcerated at the Louisiana State Penitentiary, Angola, Louisiana, attacks his conviction and sentence for second degree murder.  This matter has been referred to the undersigned for review, report, and recommendation in accordance with 28 U.S.C. § 636 and the standing orders of the Court.

## BACKGROUND

The underlying facts in this case have been set forth by the Louisiana Second Circuit Court of Appeal:

> On December 8, 2006, Defendant was at a house party at Daniel Ray Watlington's residence located on Canal Street in Shreveport, Louisiana. Watlington informed Defendant and two other men at the party, Domanike J. Flores and Rocky J. Leone, that he had received information that Troy Killough, the victim, was coming to his house with the intention of robbing the occupants therein. Killough arrived shortly thereafter and an argument ensued in the front yard of Watlington's residence, escalating into a physical altercation between Killough and the four other men.

1

After the fight, Killough agreed to take Watlington, Leone, Flores and Defendant to a house where the other people who were planning to help him rob Watlington were waiting. Leone drove the men in his white Chevrolet Tahoe to the house. The house was empty upon arrival, however, so Leone continued driving and ultimately entered I-20, heading westbound toward Greenwood, Louisiana, with the other four men still in the vehicle.

During the drive toward Greenwood, the men riding as passengers in the vehicle began to beat Killough. At one point, Defendant and Killough got into an argument because Killough and a friend of his allegedly slept with Defendant's girlfriend. While the other men continued to beat him, Killough lunged forward and grabbed the steering wheel of the Tahoe. This caused the Tahoe to collide with another vehicle on the interstate. Without stopping, the men turned around in the median and went back eastbound on I-20. The men then drove to a wooded area off Elysian Fields Road where Killough, who was severely beaten by this time, was taken from the vehicle and dragged up a hill. Defendant then shot Killough twice in the head. Killough's body was found the following day, December 9, 2006, by Larry Neal, a hunter who was checking the property on which he had a hunting lease.

Over the course of the investigation following Killough's murder, Defendant was interviewed on two separate occasions, once on December 10, 2006, by lead criminal Detective Michael Escude of the Caddo Parish Sheriff's Office, and a second time on December 11, 2006, by Detective Terry Richardson of the Caddo Parish Sheriff's Office. During the second interview, Defendant admitted to shooting Killough and was subsequently arrested.

On January 18, 2007, a Bill of Indictment was filed charging Defendant with the first degree murder of Troy Killough in violation of La. R.S. 14:30. An amended indictment was subsequently filed on September 24, 2009, wherein Defendant was charged with the second degree murder of Troy Killough in violation of La. R.S. 14:30.1.

* * *

Trial in the matter began on October 22, 2009. The State's first witness was Larry Neal, the man who had discovered Killough's body. Neal had a hunting lease in and around the Elysian Fields Road area off Hwy. 80 in Greenwood. Neal testified that, on December 9, 2006, he drove out to check on the leased property because he had problems with trespassers in the past. Neal entered a log road leading off Hwy. 80 and discovered Killough's body lying there with his pants down to his ankles and his shirt pulled over his head. Neal called 911 and officers from the Greenwood Police Department and the Caddo Parish Sheriff's Office arrived at the scene shortly thereafter.

2

The State called as its next witness Officer George Shaw of the Greenwood Police Department. Officer Shaw was the first officer to arrive at the scene on the day Killough's body was found. Officer Shaw observed drag marks from where it appeared that a vehicle had pulled into a drive, stopped and from which Killough's body was presumably dragged to where it was found. Officer Shaw testified that the Greenwood Fire Department then arrived and medics confirmed that Killough did not have a pulse. Officer Shaw secured the scene with crime tape and waited for deputies to arrive. Officer Shaw testified that, at this point, the Caddo Parish Sheriff's Office arrived to take over the investigation and the scene was released to its investigators.

The State also called as a witness William Young, the half brother of Watlington. Young testified that, on December 9, 2006, he had a conversation with Defendant during which Defendant told him that he shot Killough. When questioned about Defendant's demeanor in making these statements, Young replied that Defendant appeared to be "[g]loating like he liked it. Like he did something for himself."

The State then called Detective Michael Escude of the Caddo Parish Sheriff's Office, who conducted the first interview with Defendant at the CID office on December 10, 2006. As previously mentioned, Detective Escude testified that Defendant requested to speak to detectives because he had heard they were looking for him. When contacted by Defendant, Detective Escude asked him to come to the CID office and he arrived later that afternoon. At this time, Defendant told Detective Escude that the night before Killough's body was discovered, Killough had contacted him because he was "looking to score some marijuana and what they refer to as an eight ball." Detective Escude testified that, during this interview, he did not have any information linking Defendant to the murder of Killough and was only viewing him as a potential witness. For this reason, Defendant was told he was free to leave the CID office after finishing the interview.

Dr. Frank Peretti, a forensic pathologist from Little Rock, Arkansas, also testified as a witness for the State. Dr. Peretti performed the autopsy of Killough and recorded in his autopsy report that Killough had sustained two gunshot wounds to the head. Dr. Peretti also noted abrasions on Killough's back indicating that his body had been dragged. He further noted a black eye and a contusion on Killough's nose, which he opined to be the result of blunt force injury arising from being beaten. In Dr. Peretti's final opinion, he concluded that Killough died from a gunshot wound to the head.

The State called as its next witness Domanike J. Flores. Flores was one of the men present at Watlington's house party and was also present during the course of events that ultimately led to Killough's murder. Flores was initially charged with murder when arrested, but entered into a plea agreement with the State wherein he pled guilty to manslaughter. In exchange for his truthful and cooperative testimony, Flores

3

received a sentence of 13 1/2 years with credit for time served.

Flores is friends with Leone, the owner of the vehicle that Leone, Killough, Defendant, Flores and Watlington were riding around in on the night of December 8, 2006. Flores testified that there was a house party that evening at Watlington's residence and that he and Leone had gone to the house in Leone's Tahoe to pick up some money from Watlington. Flores testified that the first time he had met Defendant was that night at the party at Watlington's house. Flores testified that there was a discussion among himself, Watlington and Defendant about the alleged plans of Killough and some other guys to rob Watlington.

Flores further testified that Killough arrived at Watlington's house with one other person who left while Killough remained. Killough went into the house and asked to buy some "X pills," at which time Watlington brought it to Leone's attention that Killough had come to the house with plans to rob them. Flores, Watlington, Defendant, Leone and Killough then went outside and Leone and Killough got into a physical altercation. Soon thereafter, Watlington and Flores joined in the fight. When the fight ended, Killough offered to take Leone, Flores, Watlington and Defendant to the house where his alleged co-conspirators were waiting. The five men got into Leone's Tahoe and drove to the house, but it was empty. At this point, before driving off, Flores suggested they put Killough out of the vehicle because he was already beaten up, but, instead, Leone continued to drive toward I-20. Killough had a bloody nose and was in the back seat sitting between Watlington and Defendant.

Flores then testified that the men began heading down I-20 toward Greenwood, during which time Killough and Defendant began arguing over a female. Defendant accused Killough of sleeping with his girlfriend, but Killough denied it. Defendant responded that he was going to "merc" Killough because Defendant was going to "marry that girl." Flores testified that he was unaware of the incident that Defendant was referring to when he accused Killough of sleeping with his girlfriend.

Flores further testified that, at one point, Killough jumped up and grabbed the steering wheel causing the Tahoe to collide with another vehicle on the interstate. Flores believed that Killough had grabbed the wheel in an attempt to escape from the vehicle. When Killough got back into his seat, Watlington grabbed him in a head lock and they began wrestling. Flores then began beating Killough in the side until Killough stopped fighting.

Flores testified that he recalled a conversation among the group in reference to taking Killough to Texas because the manslaughter laws there were a "lot less steep" than in Louisiana, but he could not recall who made the statement. According to Flores, Watlington then told Leone to take the Love's exit on I-20 and the group ultimately pulled off near a wooded area where they stopped and pulled Killough out of the

back seat. Defendant and Watlington brought Killough around to the back of the vehicle and Leone and Flores proceeded to pull Killough up a hill. Leone and Flores walked back down the hill and Defendant walked up the hill alone with a pistol in his hand. Flores testified that Killough was still breathing when he and Leone were dragging Killough up the hill. Flores testified that he then saw Defendant walk up the hill and "[t]hat's when I heard the shots." After the two shots were fired, Leone, Flores, Watlington and Defendant got back into the Tahoe and went back to Watlington's house.

Flores testified that he did not realize that anyone had a gun in the vehicle until the Tahoe collided with the other vehicle on I-20. Flores testified that, during the collision, he saw the gun fly up between the seats so he picked up the gun and handed it to Defendant. Flores testified that he was 100 percent positive that Defendant shot Killough and, further, that no one in the group pressured Defendant into shooting Killough.

The State then called Detective Terry Richardson of the Caddo Parish Sheriff's Office. Detective Richardson first spoke with Defendant during the interview which took place at the CID office on December 10, 2006. Defendant was released after that interview, but it was later determined that he needed to be further interviewed to determine the truthfulness of his initial statements and to discern any other information relevant to the murder.

In the early morning hours of December 11, 2006, Detective Richardson attempted to reach Defendant by phone, but was unsuccessful, so he went to the Old Salem Apartments, woke up Defendant and asked him to accompany detectives back to the CID office to further discuss Killough's murder . . . Defendant agreed to do so and was transported to the CID office, but was left in possession of his phone and all of his belongings because he was not under arrest at that point.

Detective Richardson then advised Defendant of his Miranda rights and Defendant signed the CID office's standard Miranda rights form acknowledging that he understood his rights. Detective Richardson testified that Defendant was not coerced in any way and no promises for anything of value were made in exchange for his giving a statement. It was during this interview that Defendant admitted to shooting Killough twice in the head. After Defendant admitted to the shooting, he was placed under arrest for the murder of Killough.

*State v. Horn*, 55 So. 3d 100, 103-107 (La. App. 2 Cir. 2010).

On October 26, 2009, a jury found Petitioner guilty as charged of second degree murder.

[doc. # 14, p. 192].  Petitioner was sentenced to life imprisonment at hard labor without the

benefit of parole, probation, or suspension of sentence.  [doc. # 19, p. 189].  Petitioner appealed to the Second Circuit Court of Appeal, raising four assignments of error: (1) sufficiency of the evidence; (2) *Batson* violation; (3) trial court erred by denying his motion to suppress; and (4) excessive sentence. *Id.* at 210.  On appeal, the state appellate court affirmed the trial court's decision and Petitioner's sentence.  *Id.* at 210; *see also Horn*, 55 So. 3d at 100.  On December 9, 2010, Petitioner sought writ to the Louisiana Supreme Court, which was denied on May 6, 2011. [doc. # 20, p. 31]; *State v. Horn*, 62 So. 3d 124 (La. 2011).

On March 6, 2012, Petitioner filed an application for Post Conviction Relief ("PCR") in the Louisiana trial court raising two claims: (1) the trial court erred in allowing presentation of DNA analysis and reports without the analyst who performed the tests available to testify, in violation of the Sixth Amendment; and, (2) ineffective assistance of trial counsel.  [doc. # 20, p. 114].  The court denied Petitioner's PCR application on April 13, 2012.  *Id.* at 147.  Petitioner's application for writs was denied by the Second Circuit on July 12, 2012.  *Id.* at 204.  His writ application to the Louisiana Supreme Court was denied on December 14, 2012.  *Id.* at 282; *State ex rel. Horn v. State*, 104 So. 3d 439 (La. 2012).

Petitioner filed the instant petition on February 19, 2013, asserting five claims for relief: (1) insufficient evidence; (2) *Batson* violation; (3) trial court committed error in denying the motion to suppress inculpatory statements; (4) violation of confrontation clause rights by admitting DNA evidence without the testimony of the analyst; and, (5) ineffective assistance of counsel.  [doc. # 1-2, p. 15].

The matter is now before the undersigned.

## LAW AND ANALYSIS

## I.      Standard of Review – 28 U.S.C. § 2254

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. § 2254,

governs *habeas corpus* relief.  The AEDPA limits how a federal court may consider *habeas* claims.

After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is

limited to the record that was before the state court[.]"  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398

(2011).  An inmate must show that the adjudication of the claim in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a

conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the

state court decides a case differently than [the Supreme Court] has on a set of materially

indistinguishable facts."  *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting

*Williams v. Taylor*, 529 U.S. 362 (2000)).  "The 'contrary to' requirement refers to holdings, as

opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-

court decision."  *Dowthitt*, 230 F.3d at 740.  Under the "unreasonable application" clause, a

federal *habeas* court may grant the writ only if the state court "identifies the correct governing

legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle

to the facts of the prisoner's case."  *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts.  Federal

courts presume such determinations to be correct; however, the petitioner can rebut this

presumption by clear and convincing evidence.  28 U.S.C. § 2254(e).

## II.    Petitioner's Claim

### 1.    Claim One: Sufficiency of the Evidence

In claim one, Petitioner argues that the State did not prove the elements of second degree murder, which requires a showing that he killed the victim while possessing the specific intent to kill or inflict great bodily harm.  [doc. # 1-2, p. 16-17].  Furthermore, Petitioner asserts that the State was required to, but did not, prove that he shot the victim in the absence of heat of blood and sudden passion.  *Id.*  Petitioner relies on three mitigating events to support his assertion of manslaughter: (1) the victim went to Watlington's residence with the alleged intent of robbing the occupants; (2) the victim allegedly slept with Petitioner's girlfriend; and (3) the victim grabbed the steering wheel of the vehicle Petitioner was traveling in, which caused a collision. *Id.* at 17-18.

When a *habeas* petitioner asserts that the evidence presented to the court was insufficient to support his conviction, the limited question before a federal *habeas* court is whether the state appellate court's decision to reject that claim was an objectively unreasonable application of the clearly established federal law set out in *Jackson v. Va.*, 443 U.S. 307 (1979).  *Williams v. Puckett*, 283 F.3d 272, 278-79 (5th Cir. 2002).  A conviction is based on sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.  The *Jackson* inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993).  Thus, a conviction may rest on sufficient evidence "even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence." *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

The Louisiana appellate court properly invoked and applied the *Jackson* standard.  *See Horn*, 55 So. 3d at 108-110.  The court referenced the definitions relevant to the crime of second

degree murder and manslaughter under Louisiana law.  *See id*. at 109.  Specifically, La. R.S.

14:30.1 defines second degree murder, in pertinent part, as "the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm."  *Id.*  Whereas

manslaughter is defined in La. R.S. 14:31 as

> "[a] homicide which would be . . . first degree murder . . . or . . . second degree
> murder . . . but the offense is committed in sudden passion or heat of blood
> immediately caused by provocation sufficient to deprive an average person of his
> self-control and cool reflection. Provocation shall not reduce a homicide to
> manslaughter if the jury finds that the offender's blood had actually cooled, or that
> an average person's blood would have cooled, at the time the offense was committed
> . . . ."

*Horn*, 55 So. 3d at 109.

The appellate court evaluated several key pieces of evidence presented at trial.  First, the

court considered the fact that Petitioner confessed to shooting the victim.  *Horn*, 55 So. 3d at

109.  Second, the court considered codefendant Flores's testimony that the victim was still

breathing when Petitioner "pulled him out of the vehicle and as he was being dragged up the hill

and that no one else in the group pressured [Petitioner] into shooting" the victim.  *Id.*  Third,

codefendant Flores testified that prior to Petitioner's decision to shoot the victim, Flores "had

recovered from the provocation of [the victim's] alleged intended robbery . . . ."  *Id.* at 110.

Fourth, during Petitioner's confession he admitted that after arguing with the victim about

allegedly sleeping with his girlfriend, he and the victim "made up and . . . hugged right there."

*Id.*

Ultimately, the Louisiana appeals court, applying the *Jackson* standard, found (1) the

evidence is sufficient to support the verdict of second degree murder, and (2) "Flores' testimony

and Defendant's own statements to Detective Richardson do not support Defendant's argument

that he shot [the victim] as a result of sudden passion or heat of blood arising from being

sufficiently provoked by the actions of [the victim]; therefore, the evidence does not support a

verdict for the lesser included offense of manslaughter." *Id.*  A review of the state court record shows that the state court's findings were entirely reasonable; thus, the undersigned cannot say that the state court's application of *Jackson* was objectively unreasonable.  Petitioner's claim for relief based on insufficiency of the evidence should be **DENIED.**

      2.    <u>Claim Two: *Batson* violation</u>

In Petitioner's second claim, he argues that the trial court erred in ruling that he did not make a *prima facie* showing in his *Batson* claim that the State excluded venire members on the sole basis of race during jury selection.  [doc. # 1-2, p. 18].  Specifically, Petitioner, a white male, contends that the State used peremptory strikes to remove African-American venire members Hall, Jones, Pullman, and Brown on the basis of race.  *Id.* at 19.

*Batson* requires defendants to demonstrate that the State used peremptory challenges in violation of the Equal Protection Clause.  *Batson v. Ky.*, 476 U.S. 79, 96-98 (1986).  Since *Batson* is clearly established Supreme Court precedent, under 28 U.S.C. § 2254(d)(2), Petitioner must demonstrate that the trial court's decision in not finding a *Batson* violation was either contrary to or involved an unreasonable application of *Batson*.

In *Batson*, the Court created a three-step analysis for trial courts to evaluate a defendant's claim of a racially discriminatory peremptory challenge.  *Id.* at 96-98.  First, "a defendant must make a *prima facie* showing that the prosecutor exercised his peremptory challenges on the basis of race."  *Id.* at 96.  Second, "[o]nce the defendant makes a *prima facie* showing, the burden shifts to the State to come forward with a [race] neutral explanation" for the use of the peremptory challenge.  *Id.* at 97.  Third, and finally, the "trial court then will have the duty to determine if the defendant has established purposeful discrimination."  *Id.* at 98.

In order to establish a *prima facie* case under *Batson*, a defendant: (1) must demonstrate

that the prosecutor's challenge was directed at a member of a cognizable racial group[1] ; (2) must then show the challenge was peremptory rather than for cause; and (3) must show circumstances sufficient to raise an inference that the prosecutor struck the prospective juror on account of race. *Batson*, 476 U.S. at 96.

The *prima facie* showing required by *Batson* is not "so onerous that a defendant would have to persuade the judge – on the basis of all the facts, some of which are impossible for the defendant to know with certainty – that the challenge was more likely than not the product of purposeful discrimination." *Johnson v. Cal.*, 545 U.S. 162, 163 (2005).  Indeed, a defendant satisfies *Batson's* first step by merely "producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Id.*

In order to demonstrate that the "facts and circumstances" of the State's use of peremptory challenges would permit the trial judge to draw an inference of racial discrimination, the defendant must "come forward with facts, not just numbers alone." *U.S. v. Branch*, 989 F.2d 752, 755 (5th Cir. 1993) (citing *U.S. v. Moore*, 895 F.2d 484, 485 (8th Cir. 1990)).  Moreover, "neither the total exclusion of a cognizable group from the jury nor the mere presence of one or two perhaps token members of the group on the jury is dispositive of whether the prima facie requirement is satisfied." *Smith v. Cain*, No. 08-698, 2009 U.S. Dist. LEXIS 71152, at *34 (M.D. La. June 19, 2009) (Riedlinger, J.).  "Factors that give rise to an inference of discrimination include, among others, a pattern of strikes against jurors of a certain race and the

---

[1] Originally, under *Batson*, the defendant needed to show in addition that he or she was a member of a "cognizable racial group" and that the prosecutor had exercised peremptory challenges against members of the defendant's race. These requirements were later eliminated in *Powers v. Ohio*, 499 U.S. 400 (1991).  It is well established that Caucasian defendants have third-party standing to assert the equal protection rights of the excluded African-American prospective jurors. *Id.*; *Campbell v. La.* 523 U.S. 392 (1998); *State v. Duncan*, 802 So. 2d 533, 542 n. 5 (La. 2001).

party's statements and questions during voir dire." *Brown v. Kinney*, 237 F.3d 556, 561 (5th Cir. 2001). Finally, in this circuit, a trial court's finding that a party has failed to make the necessary prima facie showing for purposes of *Batson* is accorded a "presumption of correctness, which can only be rebutted by clear and convincing evidence." *Soria v. Johnson*, 207 F.3d 232, 238 (5th Cir. 2000).

Here, Petitioner's attorney attempted to establish a *prima facie* case under *Batson* by pointing out that "[m]ost of the State's challenges have been used against black jurors."  [doc. # 17, p. 131].  The trial court disagreed, finding that "[b]ased upon the statistical – the Court's statistical calculations of the number of strikes and the number of tentative acceptance, the Court will deny the motion."  *Id.* at 132.

The trial court was in the best position to gauge the prosecutor's intentions for challenging the five jurors; moreover, it was in a unique position to observe firsthand the demeanor of the attorneys and venire persons, the nuances of questions asked, the racial composition of the venire, and the general atmosphere of the voir dire that simply cannot be replicated from a cold transcript.  There is nothing in the record to show that the state trial court unreasonably applied *Batson* in making its determination that Petitioner failed to make a prima facie showing.  Therefore, the undersigned cannot find that the state courts' decisions constituted an unreasonable application of *Batson*.  Petitioner's claim should be **DENIED** on this basis.

      3.    <u>Claim Three: Motion to Suppress Confession</u>

As stated above, Petitioner was interviewed twice by police, once as a potential witness and once as a suspect.  In Petitioner's third claim, he argues that "[h]e was never advised of his constitutional rights" during the first interview, and "[a]lthough . . . [he] was advised of his constitutional rights prior to . . . [the second interview], the manner in which he was tracked down and ordered to come to the station vitiated the voluntariness of the statement."  [doc. # 1-2,

p. 22].  Therefore, Petitioner argues that the trial court erred in denying his motion to suppress the confession made to detectives.

A suppression hearing was held before the state trial court on July 14, 2008, on the exact issue presented here.  The Louisiana Second Circuit Court of Appeal summarized the testimony as follows:

> Detective Escude testified that, on December 10, 2006, Defendant initially contacted the investigators and went voluntarily to the CID office to give a statement. At that time, Defendant was not in custody, was not a suspect, and the only interest investigators had in him was as a possible witness, so he was not advised of his Miranda rights. Detective Escude did not force or coerce Defendant into giving a statement, nor did he promise Defendant anything of value in exchange for giving a statement to the investigators.
>
> On December 11, 2006, Detective Richardson conducted the second interview with Defendant and testified that, when Defendant proved to be unreachable on the phone, detectives located him at the Old Salem Apartments. Defendant was asked to accompany detectives to the CID office and he voluntarily agreed to do so. Defendant was transported to the CID office by Detectives Richardson and Morgan, but was not under arrest. Before commencing the interview, Defendant was advised of his Miranda rights and he signed a "rights sheet" indicating that he understood his rights. At no time did Detectives Richardson or Morgan threaten or coerce Defendant into giving a statement, nor did they promise him anything of value or make any promises of leniency in exchange for him giving a statement. Defendant did not invoke his right to counsel or ask that questioning be stopped at any time during the interview and he voluntarily admitted to shooting Killough.

*Horn*, 55 So. 3d at 113.  The state appellate court affirmed the trial court's denial of Petitioner's motion to suppress, finding that "the State carried its burden of proving that Defendant was apprised of his *Miranda* rights and, furthermore, that Defendant's confession was free and voluntary . . . ."  *Id.*

The Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during custodial interrogation without a *Miranda* warning.  *Miranda v. Ariz.*, 384 U.S. 436, 444 (1966).  "A suspect is in custody for purposes of *Miranda* when he is placed under formal arrest or when a reasonable person in the position of the suspect would understand

13

the situation to constitute a restraint on freedom of movement to the degree that the law associates with formal arrest." *U.S. v. Gonzalez*, 121 F.3d 928, 939 n.6 (5th Cir. 1997). Interrogation, for purposes of *Miranda*, includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *R.I. v. Innis*, 446 U.S. 291, 301 (1980).

During the second interview, Petitioner was likely in custody and was interrogated by the deputies upon his arrival at the Criminal Investigation Division office ("CID office"). *See* [doc. # 14, p. 230]. However, the record shows that Petitioner knowingly, voluntarily, and intelligently waived his *Miranda* rights. The waiver inquiry "has two distinct dimensions:" waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The prosecution need not show that a waiver of *Miranda* rights was express. An "implicit waiver" of the "right to remain silent" is sufficient to admit a suspect's statement into evidence. *N.C. v. Butler*, 441 U.S. 369, 376 (1979). *Butler* made clear that a waiver of *Miranda* rights may be implied through "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." *Butler*, 441 U.S. at 373.

The record indicates that the deputies reminded Petitioner of his *Miranda* rights upon his arrival at the CID office. [doc. # 14, p. 231]. In response, Petitioner voluntarily waived his rights and agreed to speak. *Id.* In fact, Petitioner signed a "rights sheet" indicating that he understood the rights he was waiving. *Id.* As the state court found and the record reveals, there is no showing that any statements made to Petitioner were unduly threatening, coercive, or intimidating. There is no basis in the record to conclude that Petitioner did not understand his

14

rights or that the police in any way forced him to speak.  Accordingly, the undersigned cannot find that the state trial court's determinations were unreasonable.  Petitioner's claim for relief based on a violation of his Fifth Amendment right lacks merit and should be **DENIED**.

       4.   <u>Claim Four: Confrontation Clause</u>

Relying on the Supreme Court's recent holding in *Melendez-Diaz v. Mass.*, 557 U.S. 305 (2009), Petitioner argues that his Sixth Amendment Confrontation Clause right was violated because "at trial . . . a technical leader of the DNA unit was called to testify," not the technician that performed the actual analysis.  [doc. # 1-2, p. 23].

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to cross-examine the witnesses against him and bars the admission of testimonial hearsay. *Crawford v. Wash..*, 541 U.S. 36, 59 (2004).  In *Melendez-Diaz*, the Supreme Court held that certificates of analysis sworn by analysts at a state laboratory, attesting that a substance analyzed was cocaine, were affidavits within the core class of testimonial statements covered by the Confrontation Clause.  *Melendez-Diaz*, 557 U.S. 305; *see also Bullcoming v. N.M.* 131 S. Ct. 2705 (2011).

However, *Melendez–Diaz* recognized that those states which have "Notice and Demand Statutes" do not violate the Confrontation Clause because they do not shift the burden to the defendant to call the testing analyst to trial.  La. R.S. 15:499 provides that crime labs are authorized to provide proof of examination and analysis of physical evidence by providing a certificate of the person in charge of the facility.  If the State intends to introduce a certificate of analysis under La. R.S. 15:499, it must provide written notice of its intent to offer proof by certificate at least 45 days prior to trial.  La. R.S. 15:501.  The defendant may then demand that the person who conducted the examination and analysis testify by timely filing a written demand within 30 days of the notice of intent.  *Id.*  If the certificate and notice comply with La. R.S.

15:499 and 15:501, then the certificate is admissible and considered prima facie evidence of the facts provided.  La. R.S. 15:500.  However, if the defendant properly demands the testimony of the analyst who performed the tests, then the certificate is not prima facie evidence and the analyst must testify to establish the test results.  La. R.S. 15:501.

In *State v. Cunningham*, 903 So. 2d 1110 (La. 2005), the Louisiana Supreme Court found that La. R.S. 15:501 is a "notice and demand statute."  If the prosecution complies with La. R.S. 15:499 et seq., then the certificate and report are admissible and the defendant must make a timely written demand that the analyst testify, or the defendant waives his Sixth Amendment right under the Confrontation Clause.  *See also State v. Simmons*, 78 So. 3d 743 (La. 2012).  On collateral PCR review, the state court denied Petitioner's claim, finding:

> In *State v. Dukes*, 46,029 (La. App. 2 Cir. 1/26/11), 57 So.3d 489, the Court said "therefore, we find that Melendez-Diaz [*sic*] is not controlling in cases where the state has followed the proper procedures under La. R.S. 15:499 *et seq*., and that the admission of the certification of analysis in evidence at trial did not violate the defendant's rights under the Confrontation Clause. *Id*. at 496.  Moreover, the petitioner did not timely request a subpoena for the analyst who performed the DNA test at issue. Under Louisiana jurisprudence this claim has no merit and is DENIED.

[doc. # 20, p. 147].

The undersigned finds that the state court's analysis does not constitute an unreasonable application of Supreme Court law to the facts of this case.  Petitioner failed to timely request a subpoena for the analyst under the statute's requirements.  Thus, the state court did not run afoul of the Supreme Court's decision in *Melendez-Diaz*.  Accordingly, the instant claim is without merit and should be **DENIED**.

5.    Claim Five: Ineffective Assistance of Counsel

In Petitioner's final claim, he alleges ineffective assistance of counsel, contending that counsel failed to (1) call Alicia Sanders, (2) interview Dominic Flores, and (3) object to the testimony of Pat Wojtkiewicz.  [doc. # 1-2, p. 25, 28, 31].

Ineffective assistance of counsel claims may be considered under 28 U.S.C. § 2254. *See Clark v. Thaler*, 673 F.3d 410 (5th Cir. 2012); *Amos v. Thornton*, 646 F.3d 199 (5th Cir. 2011); *Pape v. Thaler*, 645 F.3d 281 (5th Cir. 2011). Substandard advice of counsel rises to a constitutional violation only if the substandard conduct deprives the petitioner of his constitutional right to a fair trial or deprives the petitioner of some other constitutional right. *Strickland v. Wash.*, 466 U.S. 668, 686-87 (1984). To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's actions fell below an objective standard of reasonableness and that the ineffectiveness of counsel prejudiced him. *Id.*

If the petitioner does not make a sufficient showing as to one prong of the test, the other prong need not be considered. *Tucker v. Johnson*, 115 F.3d 276, 281 (5th Cir. 1997). The prongs of the test also need not be analyzed in any particular order. *Goodwin v. Johnson*, 132 F.3d 162, 172 n.6 (5th Cir. 1997). Furthermore, "mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue." *Green v. Johnson*, 160 F.3d 1029, 1042-43 (5th Cir. 1998).

In applying the first prong of *Strickland*, a court should presume that the attorney's actions are encompassed within the wide range of reasonable competence and fall under the ambit of trial strategy. *See Strickland*, 466 U.S. at 689-90. The petitioner must show that the performance of counsel fell "outside the wide range of professionally competent assistance." *Id.* at 690; *Ward v. Whitley*, 21 F.3d 1355 (5th Cir. 1994).

To establish prejudice, the second prong, the petitioner must demonstrate that the attorney's actions "were so serious as to render the proceedings unreliable and fundamentally unfair." *U.S. v. Saenz-Forero*, 27 F.3d 1016, 1021 (5th Cir. 1994); *Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984). Unreliability and unfairness do not result "if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles

17

him." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993); *see also Mangum v. Hargett*, 67 F.3d 80, 84 (5th Cir. 1995).  Accordingly, counsel cannot be ineffective for failing to raise a meritless claim, *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995), and prejudice generally exists only if the defendant demonstrates that he would have received less jail time.  *U.S. v. Grammas*, 376 F.3d 433, 436 (5th Cir. 2004).

On collateral review, the state court denied Petitioner's ineffective assistance of counsel claim, finding that "Petitioner has failed to state any facts to support his allegations of ineffective assistance of counsel.  Petitioner argues that counsel 'only presented one defense,' 'failed to object to certain testimony,' and 'did not call certain witnesses.' In these allegations, petitioner has not met his burden under *Strickland* of showing a different outcome."  [doc. # 20, p. 148].

<u>Dominic Flores &  Alicia Sanders</u>

In light of the incomplete and conclusory nature of Petitioner's arguments, the undersigned cannot find that the state courts' determinations were an unreasonable application of clearly established federal law.  Claims of uncalled witnesses and failure to investigate documentary evidence are not favored in federal *habeas corpus* review because the presentation of testimonial evidence is a matter of trial strategy, and allegations of the content of a prospective witness' testimony are largely speculative.  *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001) (citing *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986)).  "[W]ithout a specific, affirmative showing of what the missing evidence or testimony would have been, a habeas court cannot even begin to apply *Strickland*'s standards because it is very difficult to assess whether counsel's performance was deficient, and nearly impossible to determine whether the petitioner was prejudiced by any deficiencies in counsel's performance."  *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994).

Petitioner alleges that Alicia Sanders, a friend of his, was interviewed by a police officer

and stated that "they drove Killough to a remote location where Leone and Flores told [Petitioner] to shoot Killough or they'd kill him."  [doc. # 1-2, p. 26].  Therefore, Petitioner contends that counsel was ineffective for failing to interview Ms. Sanders and failing to call her to testify at trial.  Furthermore, Petitioner contends that counsel was ineffective for failing to interview Dominic Flores, and that his testimony "would have provided the jury with a different insight into the mind set of the Petitioner and the relationship which existed between the victim, co-defendants and the petitioner."  *Id.* at 28-29.  However, Petitioner fails to articulate how counsel's alleged mistakes would have changed the outcome of his trial.  As Respondent properly argues, the physical evidence, the witness testimony, and Petitioner's confession all establish that "the victim had been severely beaten and tortured prior to the shooting and was in sufficient fear for his own life that he tried to wreck the vehicle in which he had been kidnaped." [doc. # 22, p. 51].  Moreover, Mr. Flores did testify at Petitioner's trial and defense counsel cross-examined him at length, emphasizing that his testimony was predicated upon the plea agreement he had received from the State.  *See* [doc. # 19, p. 111-118].

<u>Failure to object to Dr. Pat Wojkiewicz's testimony</u>

As stated above in claim four, the State complied with the procedures of La. R.S. 15:499, and Petitioner failed to request a subpoena for the DNA analyst within the statutory time frame. Therefore, counsel's objection to Dr. Wojkiewicz's testimony would have been meritless. Moreover, Petitioner fails to establish that he suffered prejudice.  As Petitioner concedes, the DNA evidence merely linked the victim to the car in which Petitioner was a passenger; however, in a recorded confession, Petitioner already admitted to killing the victim and being in the car with the victim during the kidnaping.

Petitioner failed to meet the *Strickland* standard in his application for PCR, and the state court judge correctly dismissed his initial collateral attack for that reason.  Petitioner likewise

19

fails to meet this standard in his current federal *habeas* petition, and accordingly, his claim for relief on the basis of ineffective assistance of counsel should be **DENIED**.

### CONCLUSION AND RECOMMENDATION

For the reasons stated above,

**IT IS RECOMMENDED** that the petition for *habeas corpus* filed by Petitioner Thomas Payne Horn [doc. # 1] be **DENIED and DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have **fourteen (14) days** from service of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals.  **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.**  *See* 28

U.S.C. § 2253(c)(2).  **A courtesy copy of the memorandum shall be provided to the District**

**Judge at the time of filing.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 19th day of September, 2013.


KAREN L. HAYES
U. S. MAGISTRATE JUDGE

21